352 F.3d 733
 Inbal HAYUT, Plaintiff-Appellant,
v.
STATE UNIVERSITY OF NEW YORK, State University of New York College at New Paltz, Alex Young, Individually, Richard Varbero, Individually, Gerald Benjamin, Individually, and Lewis Brownstein, Individually, Defendants-Appellees.
 Docket No. 02-9014.
 United States Court of Appeals, Second Circuit.
 Argued: April 24, 2003.
 Decided: December 18, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED William Martin, Colin Law Office, White Plains, NY, for Plaintiff-Appellant Inbal Hayut.
 Kenneth J. Kelly, Epstein, Becker & Green, P.C., New York, N.Y. (Lauren A. Malanga, on the brief), for Defendant-Appellee Alex Young, individually.
 Andrea Oser, Assistant Solicitor General, Office of the State Attorney General, Albany, N.Y. (Eliot Spitzer, Attorney General of the State of New York, and Nancy A. Spiegel, Assistant Solicitor General, Office of the State Attorney General, Albany, NY, on the brief), for Defendants-Appellees State University of New York, State University of New York College at New Paltz, Richard Varbero, individually, Gerald Benjamin, individually, and Lewis Brownstein, individually.
 Before: CALABRESI and SACK, Circuit Judges.*
 CALABRESI, Circuit Judge.
 
 
 1
 Plaintiff-Appellant Inbal Hayut seeks review of a grant of summary judgment by the United States District Court for the Northern District of New York (Howard G. Munson, Judge) entered on August 1, 2002, following a Memorandum-Decision and Order entered July 30, 2002, in favor of Defendants-Appellees on Hayut's harassment and discrimination claims brought under 42 U.S.C. § 1983, the New York Constitution, Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681, et seq., and common law.
 
 
 2
 Hayut's claims arise out of what she alleged was a pattern of humiliating and derogatory comments directed at her while she was a student at Defendant-Appellee State University of New York College at New Paltz ("SUNY New Paltz"). Specifically, Hayut's 42 U.S.C. § 1983 claim alleges that, during the Fall 1998 semester, her political science professor, Defendant-Appellee Alex Young ("Professor Young"), targeted her with derogatory and sexually-charged comments in violation of her equal protection rights under the United States Constitution. She makes analogous claims under the New York State Constitution. Hayut's Title IX claim against Defendants-Appellees State University of New York system ("SUNY") and SUNY New Paltz (collectively, the "SUNY defendants") is predicated upon their employment of Professor Young and specifically alleges the failure of officials at SUNY New Paltz to remedy Young's discrimination.
 
 
 3
 Hayut's claims against Defendants-Appellees Richard Varbero, Associate Dean of the College of Arts and Sciences at SUNY New Paltz ("Dean Varbero"), Gerald Benjamin, Dean of the College of Arts and Sciences at SUNY New Paltz ("Dean Benjamin"), and Lewis Brownstein, a tenured Professor and Chair of the Political Science Department at SUNY New Paltz ("Professor Brownstein") (collectively, the "individual defendants"), allege violations of her federal and state equal protection rights based on a respondeat superior theory, on grounds that the individual defendants failed timely and reasonably to respond to her complaints of Professor Young's harassment and that she was singled out by the individual defendants in an effort to hinder the pursuit of her harassment claim. Hayut also asserts a common law tort claim alleging ministerial neglect against the individual defendants.
 
 
 4
 The district court — rejecting all of Hayut's claims — granted summary judgment to Young, the SUNY defendants, and the individual defendants. For the reasons set forth below, we hold the court properly granted summary judgment to the SUNY defendants and the individual defendants, but erred with respect to Young. Accordingly, we affirm its judgment in part and vacate and remand it in part.
 
 I. BACKGROUND
 A. The "Monica" Comments
 
 5
 After completing two years at Rockland Community College ("RCC"), Hayut enrolled at SUNY New Paltz for the 1998-99 academic year. Hayut, a political science major, registered for two courses with Professor Young, a tenured political science professor. Each course met twice weekly during the Fall 1998 semester. According to Hayut, Professor Young's sexual harassment of her began approximately three weeks into the semester. Initially, the harassment consisted of Professor Young referring to Hayut by the nickname "Monica," in light of her supposed physical resemblance to Monica Lewinsky, a former White House intern who at that time was attaining notoriety for her involvement in a widely-covered sex scandal with then-President William J. Clinton.
 
 
 6
 According to the testimony of some witnesses, Hayut initially laughed at the nickname, rolled her eyes, or simply shrugged her shoulders, giving no outward indication that the comments troubled her. However, Young's use of this nickname persisted even after Hayut requested that he stop. Despite her protestations, Professor Young would occasionally, in dramatic fashion, attempt to locate Hayut in the classroom by sitting in front of his desk and screaming the name "Monica." Hayut maintains that the "Monica" comments occurred at least once per class period throughout the rest of the semester and persisted even in her absence.[1] Hayut also maintains that, on occasion, Professor Young addressed her as "Monica" outside of class when they happened to pass each other.
 
 
 7
 Professor Young's conduct was not limited to using the "Monica" nickname, but included other comments as well. These added context to the nickname by associating Hayut with some of the more sordid details of the Clinton/Lewinsky scandal. Specifically, Professor Young referred to some of Clinton's and Lewinsky's more notorious conduct, including "[h]ow was your weekend with Bill?," which question Hayut claims he asked virtually every Tuesday morning class session. In addition to this "weekend" comment, Professor Young also told Hayut to "[b]e quiet, Monica. I will give you a cigar later." Hayut testified that the "cigar" comment was uttered twice during the Fall 1998 semester, once in her afternoon class period with Professor Young (after he had observed Hayut talking to another student during a lecture), and the second in the very next morning class session. Finally, Professor Young observed to Hayut, in front of her peers, that "[y]ou are wearing the same color lipstick that Monica wears." Hayut testified in her deposition that these specific comments by Professor Young — particularly the "cigar" comment — evoked shock and disbelief from students in the class.
 
 
 8
 Hayut also testified during her deposition that, on at least one occasion in the middle of the semester, Professor Young's remarks upset her to the point that she began crying and walked out during his lecture. Hayut did not, however, ever approach Professor Young after class, in the hallway, or in his office to discuss her disapproval of the "Monica" nickname and of his other comments, despite having the opportunity to do so.[2]
 
 
 9
 Hayut did not, moreover, report Professor Young's conduct to school officials early in the Fall 1998 semester. She clearly could have done so. Thus, after returning from a two-week absence mid-semester, Hayut met with Professor Brownstein. In addition to serving as Chair of the Political Science department, Professor Brownstein also served as Hayut's academic advisor. During this meeting, Hayut discussed the work she had missed in Professor Brownstein's course. She ultimately decided to withdraw from his class after determining that she would be unable to make up the work. Significantly, Hayut never mentioned Professor Young's conduct to Professor Brownstein at this Fall 1998 meeting.
 
 
 10
 Hayut maintains that the "Monica" comments affected her deeply, humiliating her in front of her peers, causing her to experience difficulty sleeping, and making it difficult for her to concentrate in school and at work. At times, Hayut feared that new developments in the Clinton/Lewinsky scandal would induce Young to come up with a new, off-color comment at her expense and, therefore, she avoided watching the news. Hayut also testified that, despite her protestations, Professor Young's "Monica" references led other students — primarily male — to address her as "Monica" in a ridiculing manner outside of class.
 
 B. Hayut Complains To SUNY New Paltz
 
 11
 In early December 1998, prior to the final exam period, Hayut visited Dean Varbero to complain about Professor Young's conduct. Hayut's friend Merante proposed the meeting with Dean Varbero as Merante wanted to voice numerous complaints of her own about Professor Young's teaching style, including his classroom temperament, his alleged unfair treatment of the students, and his "dictatorial" teaching style. During the course of the meeting, Merante mentioned Professor Young's "Monica" statements. Dean Varbero turned to Hayut to inquire and Hayut confirmed that she felt Professor Young had harassed her with the "Monica" comments. Dean Varbero then discussed Hayut's allegations with her for over one hour. He said that, if true, Professor Young's conduct would be viewed by the administration as a serious matter. And he also referred Hayut to Professor Brownstein who, because of his position in Professor Young's immediate chain of command, would have a particular interest in this matter. According to Merante, Dean Varbero specifically instructed Hayut to report Young's conduct to Professor Brownstein. Although this was an informal avenue of redress, Dean Varbero made clear to Hayut that if she was at all dissatisfied with Professor Brownstein's response, she was to report back to Dean Varbero for action. Dean Varbero also indicated that, in accordance with school policy, if Hayut sought more formal action, she would ultimately need to reduce her complaint to writing.[3]
 
 
 12
 Merante recalled that Dean Varbero took the additional step of attempting to contact Professor Brownstein in order to arrange an appointment on Hayut's behalf. Professor Brownstein's secretary told Dean Varbero that, because students were taking final exams during that week, Professor Brownstein was not holding regular office hours and his availability was unpredictable. The secretary suggested that Hayut should simply visit Professor Brownstein's office. Hayut agreed to do so and left Dean Varbero's office.
 
 
 13
 Hayut went to Professor Brownstein's office but found him unavailable. She waited briefly and then left without indicating the nature of her visit or asking that Professor Brownstein contact her about the matter. Hayut maintains that she subsequently returned to Professor Brownstein's office but, again, found him unavailable. At no time did Hayut make further contact with Dean Varbero to discuss her inability to meet with Professor Brownstein or any possible dissatisfaction with how her informal complaint was being handled by the administration.
 
 
 14
 Hayut did not actually speak with Professor Brownstein until late January 1999, when she met with him to discuss her Spring 1999 class schedule. During this meeting, Hayut told Professor Brownstein of Professor Young's conduct. She did not, however, submit a written complaint to him or to anyone else. Nor did she make any other effort to pursue her verbal complaint with other members of the administration. After hearing about Professor Young's conduct, Professor Brownstein echoed Dean Varbero's advice that Hayut should submit a written complaint.
 
 
 15
 Despite Hayut's failure to re-visit Dean Varbero, Dean Varbero himself had notified Professor Brownstein and Dean Benjamin of the matter. And, on February 11, 1999, before Hayut submitted a written complaint, a number of college officials including Dean Benjamin, Dean Varbero, Professor Brownstein, Gail Gallerie, the Executive Assistant to SUNY New Paltz's President, and Grace Pell, SUNY New Paltz's Affirmative Action Officer ("AAO"), attended a meeting to discuss Professor Young's conduct. All officials agreed that Young's contract with SUNY New Paltz entitled him to written notice of the charges before SUNY could initiate any formal process and, if appropriate, impose disciplinary measures.[4] Likewise, SUNY New Paltz's internal grievance procedures required that, if formal action was sought through the Affirmative Action Office, all grievances of this sort had to be submitted by the claimant in writing to the AAO within 45 days of the discriminatory act. The various university officials readily agreed that, if true, the allegations were sufficiently serious to warrant a formal response.
 
 
 16
 On February 16, 1999, after the Spring 1999 semester had begun, Hayut delivered a written complaint to Professor Brownstein.[5] The day after receiving the written complaint, Dean Benjamin, Dean Varbero, and Professor Brownstein convened a counseling session with Young to address matters raised in the complaint. Young admitted to having made the remarks. He indicated at that counseling session that the "Monica" comments had been intended only as jokes, although he later conceded during a deposition in connection with this action that the "Monica" statements were also intended as a form of discipline, uttered when Hayut was disrupting the class by talking or eating. Dean Benjamin informed Professor Young that the matter would be taken seriously. Part of the administration's response, according to Dean Benjamin, included a formal letter to Professor Young emphasizing what behavior the school expected of its professors and explaining what actions Dean Benjamin would take.
 
 
 17
 Within days of the counseling session, Professor Young, who had nearly thirty years of teaching experience, discussed the possibility of retirement. Dean Benjamin agreed that Young's voluntary departure from SUNY New Paltz would be in the best interest of all parties. On March 18, 1999, Young tendered his resignation, which was promptly accepted.
 
 
 18
 Hayut had enrolled in various classes for the Spring 1999 semester, none of which were taught by Professor Young. Hayut admits she had no further contact with Professor Young and suffered no harassment from him after conclusion of the Fall 1998 semester. Sometime after delivering her written complaint, Hayut simply stopped attending classes. This led to her receiving failing grades in all courses for that semester. Hayut attempted to transfer to Pace University ("Pace") for the upcoming Fall 1999 semester, but — due to her poor academic performance at SUNY — was unable to do so without first completing one year of remedial education.
 
 C. Hayut's Suit
 
 19
 On February 2, 2000, Hayut brought an action in the Southern District of New York (subsequently transferred to the Northern District of New York), against Young, the SUNY defendants, and the individual defendants alleging unlawful discrimination and harassment in violation her federal equal protection rights, see U.S. Const. amend. XIV, § 1, as actionable under 42 U.S.C. §§ 1983 and 1988, her state equal protection rights, see N.Y. Const. art. I, § 11, Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681-1688, and the New York State Human Rights Law, N.Y. Exec. Law § 296. Hayut also asserted various common law tort claims: for ministerial neglect, defamation, and intentional infliction of emotional distress. Pursuant to Federal Rule of Civil Procedure 12(b)(6), Young moved to dismiss for failure to state a cause of action. The SUNY defendants and the individual defendants moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).
 
 
 20
 In a Memorandum-Decision and Order dated December 18, 2000, the district court (David N. Hurd, Judge), granted the various motions in part and denied them in part. Hayut v. State Univ. of New York, et al., 127 F.Supp.2d 333 (N.D.N.Y.2000) ("Hayut I"). Those of Hayut's original claims that were dismissed in Hayut I are not the subject of this appeal. Remaining in the action after Hayut I were (1) Hayut's federal and state equal protection claims against Young; (2) Hayut's Title IX claim against the SUNY defendants; (3) Hayut's federal and state equal protection claims against the individual defendants; (4) Hayut's New York Human Rights Law claim against Young and the individual defendants; and (5) Hayut's common law tort claim for ministerial neglect against the individual defendants.
 
 
 21
 Defendants-Appellees filed separate motions for summary judgment, which the district court granted in toto in a Memorandum-Decision and Order dated July 30, 2002. Hayut v. State Univ. of New York, et al., 217 F.Supp.2d 280 (N.D.N.Y.2002) ("Hayut II"). Judgment was entered on August 1, 2002. This timely appeal followed.
 
 II. DISCUSSION
 
 22
 Hayut appeals the district court's grant of summary judgment on all of the claims dismissed in Hayut II, except for her state equal protection claim against Young and her state Human Rights Law claims, neither of which she now asserts. Accordingly, those claims are deemed abandoned. See Herrmann v. Moore, 576 F.2d 453, 455 (2d Cir.), cert. denied, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978). The question at the heart of this appeal is whether Hayut has presented sufficient evidence to survive summary judgment on her remaining discrimination claims.
 
 
 23
 For the reasons discussed below, with respect to her section 1983 federal equal protection claim against Young, we find sufficient, disputed evidence in the record to make a summary judgment inappropriate. On the other hand, we find there is insufficient evidence supporting the claims against the SUNY defendants and the individual defendants to survive judgment as a matter of law. We, therefore, vacate and remand the judgment of the district court which deals with Hayut's section 1983 claim against Young, but affirm the district court's grant of summary judgment on all other claims raised on appeal.
 
 A. Standard of Review
 
 24
 This Court reviews the district court's grant of a motion for summary judgment de novo. Singer v. Fulton County Sheriff, 63 F.3d 110, 114 (2d Cir. 1995). Summary judgment is appropriate "`if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Indeed, Rule 56(c) of the Federal Rules of Civil Procedure unequivocally "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id.
 
 
 25
 In determining whether a genuine issue actually exists and, thus, whether or not summary judgment is appropriate, courts may "not ... weigh the evidence, but [are] instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Weyant v. Okst, 101 F.3d 845, 854 (2d Cir.1996) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(e) Advisory Committee Note (1963)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Liberty Lobby, 477 U.S. at 252, 106 S.Ct. 2505.
 
 B. Section 1983 Claim Against Young
 
 26
 Hayut's section 1983 claim alleges that Professor Young violated her Fourteenth Amendment equal protection rights by engaging in sexual harassment. She claims that Professor Young's "Monica" comments had sexual overtones and created a hostile environment for her during her courses with him. Hayut has never asserted that Professor Young's harassment involved any conduct other than the nickname and the scandalous references.[6] She maintains, however, that, beginning approximately in the third week of classes, these comments occurred during every period of instruction with Professor Young, and that they were sufficiently offensive and humiliating to cause her great distress and to interfere unduly with her academic performance.
 
 
 27
 In order to survive a summary judgment motion on her section 1983 claim for sexual harassment, Hayut must proffer evidence that (1) Young was acting "under color of state law" at the time he committed the conduct complained of, and (2) that his conduct deprived her of "`rights, privileges or immunities secured by the Constitution or laws of the United States.'" Greenwich Citizens Comm., Inc. v. Counties of Warren & Washington Indus. Dev. Agency, 77 F.3d 26, 29-30 (2d Cir.1996) (quoting Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)).
 
 
 28
 It is these questions, therefore, which we now address.
 
 1. Color of State Law
 
 29
 The Supreme Court has recognized that an individual is acting under color of state law when exercising power "`possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Polk County v. Dodson, 454 U.S. 312, 317-18, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (quoting United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)); see also West v. Atkins, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). As a general rule, "`state employment is ... sufficient to render the defendant a state actor.'" West, 487 U.S. at 49, 108 S.Ct. 2250 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 936 n. 18, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). For purposes of a section 1983 action, a defendant necessarily "acts under color of state law when he abuses the position given to him by the State." West, 487 U.S. at 50, 108 S.Ct. 2250; see also Christian v. Belcher, 888 F.2d 410, 414 (6th Cir.1989) ("[B]efore a defendant may be held liable under section 1983, that defendant must first possess power by virtue of state law, then misuse that power in a way that violates federal constitutional rights.").
 
 
 30
 We think it clear that a professor employed at a state university is a state actor. A professor at a state university is vested with a great deal of authority over his students with respect to grades and academic advancement by virtue of that position. When a professor misuses that authority in the course of performing his duties, he necessarily acts under color of state law for purposes of a section 1983 action. See, e.g., Gonzalez v. Kahan, 1996 WL 705320 at *2 (E.D.N.Y.1996) (finding tenured professor at the City University of New York accused of sexually harassing student to have acted under color of state law); c.f. Saulpaugh v. Monroe Comm. Hosp., 4 F.3d 134, 143-44 (2d Cir.1993), cert. denied, 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994) (upholding a section 1983 claim based on the equal protection clause against a public hospital official for sexual harassment of an employee under his supervisory authority). We, therefore, agree with the district court that Professor Young's position as a professor at SUNY New Paltz was such that if he abused the authority given him — as we think a reasonable jury could find — this threshold requirement would be satisfied. See Hayut II, 217 F.Supp.2d at 286. The question, then, is whether Hayut presented sufficient evidence to raise a triable issue of fact with respect to the severity or pervasiveness of Professor Young's conduct. We think she did.
 
 2. Hostile Educational Environment
 
 31
 Hayut claims Professor Young's "Monica" comments created a hostile educational environment for her. Section 1983 sexual harassment claims that are based on a "hostile environment" theory, like Hayut's, are governed by traditional Title VII "hostile environment" jurisprudence. See Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir.1998); Jemmott v. Coughlin, 85 F.3d 61, 67 (2d Cir. 1996). As a result, surviving summary judgment on a hostile environment claim under section 1983 (as under Title VII) requires evidence not only that the victim subjectively perceived the environment to be hostile or abusive, but also that the environment was objectively hostile and abusive, that is, that it was "permeated with `discriminatory intimidation, ridicule, and insult,' ... that is `sufficiently severe or pervasive to alter the conditions'" of, in this case, the victim's educational environment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations omitted) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); see also Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir.1995) (requiring that the harassment "`has the purpose or effect of unreasonably interfering with an individual's ... performance or creating an intimidating, hostile, or offensive ... environment.'") (quoting Vinson, 477 U.S. at 65, 106 S.Ct. 2399), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).
 
 
 32
 Making a "hostility" determination in the educational context, as in the employment context, entails examining the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with" the victim's academic performance. See Harris, 510 U.S. at 23, 114 S.Ct. 367. While the effect on a victim's psychological well-being is relevant to the subjective component in the analysis, its presence, or absence, is not dispositive on the issue of severity, as "no single factor is required." Id. Finding the harassment "pervasive" means that the challenged incidents are "more than episodic; they must be sufficiently continuous and concerted." Carrero v. New York City Hous. Auth., 890 F.2d 569, 577 (2d Cir.1989). There also must be evidence that the alleged discrimination was carried out because of sex. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Generally speaking, this analysis is fact-specific and, therefore, as in this case, is best left for trial.
 
 
 33
 As an initial matter, we note that Young does not dispute that he addressed Hayut as "Monica" or that he made the other "Monica" comments. He stated that the comments were intended to be taken in a joking manner but, later, characterized them as a form of discipline. Professor Young articulates no defenses for his conduct and, specifically, has never expressly asserted that the comments complemented his classroom curriculum or had any other legitimate pedagogical purpose that might merit the kind of First Amendment protection that has long been recognized in the academic arena. See, e.g., Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) ("[Academic] freedom is ... a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom."); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) ("It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."). We, therefore, express no view on (a) whether such a defense could have been, or could still be, made, or (b) if made, whether this claim would entail issues of fact or law.
 
 
 34
 Additionally, we agree with the district court and find that Hayut has put forth sufficient evidence (principally her own testimony) to permit a reasonable factfinder to conclude that she subjectively found Professor Young's conduct offensive. Hayut II, 217 F.Supp.2d at 286. Accordingly, our analysis focuses on whether a jury could also find that Professor Young's conduct created an educational environment (a) which rose to an objective level of hostility on the basis of sex, and (b) which had an adverse effect on the terms and conditions of her educational experience. See Harris, 510 U.S. at 21, 114 S.Ct. 367. We think a jury could so construe the evidence.
 
 
 35
 
 a. Pervasiveness
 
 
 
 36
 The evidence presented permits a reasonable trier of fact to find that the comments were sufficiently pervasive to create a hostile environment. Professor Young allegedly uttered some form of "Monica" comment during many periods of instruction with Hayut and even, on occasion, outside the classroom. The classroom comments routinely occurred shortly after each period of instruction had begun and in front of a fully-assembled class. The evidence that Professor Young's conduct permeated the classroom atmosphere and set the tone for the whole class is sufficient to satisfy the "pervasiveness" requirement at the summary judgment stage.
 
 
 37
 We reject the district court's attempt to employ a mathematical equation of sorts to calculate the number of instances of misconduct in order to show that Professor Young's behavior did not pervade and color the classes throughout the entire semester. Hayut II, 217 F.Supp.2d at 287. The district court began, for example, by finding that during October 1998, Hayut missed approximately five classes in each of her courses with Professor Young (she took a two-week trip to Israel for her brother's bar mitzvah). Id. The court then calculated the remaining days in which Professor Young uttered a "Monica" comment in Hayut's presence, and deemed his remarks "sporadic and infrequent," and, hence, non-actionable. We believe the court's approach to be erroneous for several reasons.
 
 
 38
 First, a rigid "calculate and compare" methodology ignores the proper role of courts which, at the summary judgment stage, is to construe all facts and draw all inferences in the light most favorable to the nonmovant. See Weyant, 101 F.3d at 854. Also, such an approach, if strictly followed, disregards Supreme Court guidance that hostile environment analysis "is not, and by its nature cannot be, a mathematically precise test." Harris, 510 U.S. at 22, 114 S.Ct. 367. Because of the fact-specific and circumstance-driven nature of hostile environment claims, courts must be mindful that "`the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable.'" Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir.2000) (quoting Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 439 (2d Cir.1999)). And courts should not, themselves, attempt to establish an absolute baseline for actionable behavior. See id.
 
 
 39
 Additionally, as applied specifically to the facts in this case, we think the district court's approach to be flawed. The court did not adequately consider the fact that in just about half the periods of instruction taught by Professor Young which Hayut attended, Hayut was the target of "Monica" comments. These comments, moreover, were generally made at or near the beginning of the period, thereby setting the tone for the remainder of the class period. The court also ignored evidence that Professor Young continued the harassment by referring to Hayut, in her absence, as "Monica." Professor Young's persistent mention of "Monica" when speaking of Hayut when she was not there can, of course, be relevant evidence in a discrimination claim. See Leibovitz v. New York City Transit Auth., 252 F.3d 179, 190 (2d Cir.2001) (recognizing harassing remarks made outside a plaintiff's presence as germane to a hostile work environment claim). Whether a factfinder will, on balance, decide that the remarks reached the objective level of pervasiveness required by law is not for us to say. It is quite sufficient that there be enough evidence in the record from which a reasonable jury could so conclude. And of that we have no doubt.
 
 
 40
 
 b. Severity
 
 
 
 41
 We also find sufficient evidence to permit a trier of fact to find that the "Monica" comments were severe enough to transcend the bounds of propriety and decency, let alone harmless humor, and become actionable harassment based on Hayut's sex. The "Monica" nickname — pulled from the headlines covering the contemporaneous Clinton/Lewinsky scandal — can readily be understood as having powerful sexual connotations and overtones. This is especially so in light of Professor Young's "cigar" and "weekend" comments. Each remark, while brief, was made against a backdrop of classroom discussions and press coverage of the most salacious developments in the scandal. A reasonable jury could find that the "Monica" statements were more than mere joking comments or occasional vulgar banter, but were sexually-charged and designed by Young to convey certain images about Hayut — that she "enjoyed the same sexual implements as the real Monica Lewinsky and that Ms. Hayut was a willing participant in deviant sexual activity with Young himself...." Pl. Brief at 7. There is, moreover, evidence in the record that suggests that, by discussing the sordid details of the Clinton/Lewinsky scandal, Professor Young made Lewinsky the focal point and object of ridicule of some of his classes. By then directing "Monica" comments toward Hayut, Professor Young likewise made Hayut the object of ridicule.
 
 
 42
 The district court characterizes Young's conduct as "highly offensive and obviously inappropriate." Hayut II, 217 F.Supp.2d at 287. We believe that this characterization of Young's conduct, and specifically of his comments of a sexual nature, given their frequency, compels the conclusion that a reasonable jury could find that his actions "transcend[ed] coarse, hostile and boorish behavior" and became actionable as a constitutional tort. Annis v. County of Westchester, 36 F.3d 251, 254 (2d Cir.1994).
 
 
 43
 The reactions of Hayut's peers and of various administrators at SUNY New Paltz are also significant to the mandated objective analysis. Hayut's testimony regarding the effect of Professor Young's behavior is corroborated by several individuals attending Professor Young's classes. These heard firsthand his "Monica" comments and testified that they, too, found the behavior embarrassing and offensive. Likewise, when first informed by Hayut about Professor Young's conduct, Dean Varbero considered the allegations to be serious. When Dean Varbero, Dean Benjamin, Professor Brownstein, Gail Gallerie, the Executive Assistant to the College President, and Grace Pell, the SUNY New Paltz AAO, convened a meeting, they all agreed that, if substantiated, Professor Young's conduct warranted formal action.
 
 
 44
 Young has never disputed that he engaged in the challenged conduct and there is no evidence that he singled out any other student for similar, recurring, treatment. Young maintains, however, that, as a matter of law, his comments do not rise to the level of actionable harassment. He suggests that the response of others, including Dean Benjamin, "is not evidence of sexual harassment, but rather a layman's conclusion." But that is precisely the kind of question best reserved for the trier of fact. At a minimum, how others such as Dean Benjamin and Dean Varbero reacted upon learning of the conduct provides some evidence about the conduct's objectionable nature and, in this case, helps to create a triable issue of fact regarding the objectively offensive nature of Young's conduct.
 
 
 45
 
 c. Harassment Because of Sex
 
 
 
 46
 Targeting Hayut for her likeness to Lewinsky was, without question, driven by Hayut's gender. The "Monica" nickname served as a springboard for yet more vulgar "cigar," "weekend," and "lipstick" comments, which were also not likely to have been uttered but for Hayut's gender.[7] Moreover, targeting Hayut because of her gender is consistent with evidence that Young exhibited hostility toward women generally, and made negative references to their proper societal status. All this is, of course, relevant to her claim. See Whidbee, 223 F.3d at 70 n. 9 (the environment as a whole is germane to an individual plaintiff's hostile environment claim) (citing Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir.2000)). Accordingly, we find sufficient evidence in the record from which a trier of fact could conclude that Professor Young's conduct was motivated, at least in part, by Hayut's gender.
 
 
 47
 
 d. Injury and/or Interference With Educational Progress
 
 
 
 48
 We also find enough evidence that Hayut was adversely affected by Professor Young's actions and that a reasonable person similarly-situated would have also been affected. Although Hayut's academic performance does not appear to have suffered during her time in Professor Young's classes (as compared to her prior performance at RCC and her later performance at Pace), she testified that, because of her treatment, she was unable to concentrate on her studies. Regardless of what external distractions may have weighed on Hayut during the Fall 1998 semester and contributed to her poor academic performance, Hayut also testified that she felt humiliation and emotional distress, did not want to attend classes, and was unable to sleep. That is enough to render this issue one for the trier of fact. See, e.g., Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 76 (2d Cir.2001) (finding that the victim's testimony about the effect on her ability to work due to the harassment creates a triable issue regarding the unreasonable interference of the harassment).[8]
 
 
 49
 Nor do Hayut's admitted participation in class discussions despite the "Monica" comments, her failure to object initially to the comments, and her failure to report the conduct earlier to one of Professor Young's supervisors negate Hayut's evidence that she found the comments offensive and humiliating. Given the power disparity between teacher and student a factfinder could reasonably conclude that a student-victim's inaction, or counter-intuitive reaction, does not reflect the true impact of objectionable conduct.
 
 
 50
 In this case especially, in view of the evidence of Professor Young's "dictatorial" lecture style, frequent angry outbursts, general intimidation of students, and nonreceptiveness to student criticism or complaint, summary judgment cannot be based on Hayut's failure to object to, correct, or question Professor Young's conduct earlier in the period of alleged harassment. In order to be actionable, conduct need not be "unendurable" or "intolerable." Whidbee, 223 F.3d at 70. And what students put up with, without objection or protest, does not mark the bounds of permissible classroom conduct. C.f. Vega v. Miller, 273 F.3d 460, 468 (2d Cir.2001) (holding, in a section 1983 action by discharged professor who alleged violation of his academic freedom, that "what students will silently endure is not the measure of what a college must tolerate"). Under the circumstances, it is entirely reasonable to believe that Hayut, in her first semester at SUNY New Paltz, was herself intimidated by Professor Young, and was hesitant to speak out for fear of potential verbal and academic backlash.
 
 
 51
 For the foregoing reasons, we find genuine issues of material fact regarding Hayut's section 1983 claim against Young. Accordingly, the district court's grant of summary judgment on this claim is vacated, the claim is reinstated, and the matter is remanded to the district court for further proceedings consistent with this opinion.[9]
 
 
 52
 C. Title IX Claim Against the SUNY Defendants
 
 
 53
 Hayut does not claim that she suffered any harm as a result of the official policies or procedures of SUNY or SUNY New Paltz. These include the internal grievance and complaint procedures for reporting and responding to allegations of harassment or discrimination. Rather, she alleges that SUNY and SUNY New Paltz are liable under Title IX by virtue of their employment of Young.
 
 
 54
 Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, prohibits sexual discrimination (including harassment) by federally-funded educational institutions. See 20 U.S.C. § 1681(a)[10]. The Supreme Court has recognized an implied private right of action under Title IX, see Cannon v. University of Chicago, 441 U.S. 677, 691, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), and has held that money damages are available in such suits, see Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 65-66, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). "Discrimination" for purposes of Title IX liability, is not limited to disparate provision of programs, aid, benefits or services or inequitable application of rules or sanctions. See 45 C.F.R. § 86.31 (2000). It has, instead, been recognized as also encompassing teacher-on-student hostile educational environment sexual harassment. See Franklin, 503 U.S. at 75, 112 S.Ct. 1028 (holding that teacher's sexual harassment of student constitutes "discrimination" on the basis of sex); see also Kracunas v. Iona College, 119 F.3d 80, 86 (2d Cir.1997) ("When a teacher sexually harasses a student, that teacher `discriminates on the basis of sex' in violation of Title IX.") (quoting Franklin, 503 U.S. at 75, 112 S.Ct. 1028) (internal formatting omitted).
 
 
 55
 Hayut seeks money damages as well as corrective action. As such, to survive summary judgment, her Title IX claim needs more than evidence that Professor Young's conduct created an educational environment sufficiently hostile as to deprive her of "access to the educational opportunities or benefits" provided by SUNY New Paltz. See Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 650, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). Hayut must also provide evidence that one or more of the individual defendants, who admittedly are vested with "authority to address the alleged discrimination and to institute corrective measures" on Hayut's behalf, had "actual knowledge of [the] discrimination... and fail[ed] adequately to respond." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).
 
 
 56
 We determined above that Hayut presented sufficient evidence in connection with her hostile environment harassment claim against Professor Young to survive summary judgment. We also find that, to the extent the evidence suggests that Professor Young's conduct (a) discouraged Hayut from more active involvement in his classroom discussions, (b) compelled her to avoid taking additional courses taught by Professor Young, (c) caused her to withdraw from SUNY New Paltz altogether, or (d) simply created a disparately hostile educational environment relative to her peers, the above-described harassment could be construed as depriving Hayut of the benefits and educational opportunities available at SUNY New Paltz. We therefore look to the actions of the officials involved — the individual SUNY defendants — to determine whether Title IX liability lies against them. In doing so, we examine whether one or more of these defendants had actual knowledge of Professor Young's conduct and failed to respond adequately and appropriately.
 
 1. Actual Notice
 
 57
 Requiring actual, as opposed to constructive, knowledge imposes a greater evidentiary burden on a Title IX claimant. It is this burden that we do not believe Hayut has met.[11]
 
 
 58
 Hayut's oral and written complaint describes being subjected to harassment from Professor Young only prior to her meeting with Dean Varbero. And we find no other evidence suggesting that any of the individual defendants had actual knowledge of Young's conduct before Hayut's verbal report to Dean Varbero in December 1998. It follows that the SUNY defendants cannot be held liable under Title IX for any harassment that occurred during the Fall 1998 semester. See Gebser, 524 U.S. at 290, 118 S.Ct. 1989. But that is the only time during which Hayut claims that she was harassed by Young. Hayut concedes as well that she had no further contact with Young and admits, therefore, that she endured no additional harassment from him after her complaint to Dean Varbero. Since, however, as Hayut alleges, some lingering, residual effects of Young's actions (i.e., other students addressing Hayut as "Monica") may have extended into the Spring 1999 semester and may fairly be attributable to the hostile environment created and fostered by Professor Young, we examine the response rendered by the individual defendants, the SUNY New Paltz officials.
 
 2. Adequate Response
 
 59
 The Supreme Court has held that Title IX's requirement of an "adequate response" is violated not only if school officials render no response, as alleged by Hayut, but also if the response that is rendered "amount[s] to deliberate indifference to discrimination." Gebser, 524 U.S. at 290, 118 S.Ct. 1989; see Davis, 526 U.S. at 642, 119 S.Ct. 1661 (the educational institution "could be liable for damages only where the [institution] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of... harassment of which it had actual knowledge."). Deliberate indifference may be found both "when the defendant's response to known discrimination `is clearly unreasonable in light of the known circumstances,'" Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 141 (2d Cir.1999) (quoting Davis, 526 U.S. at 648, 119 S.Ct. 1661), and when remedial action only follows after "a lengthy and unjustified delay," Bruneau v. South Kortright Cent. Sch. Dist., 163 F.3d 749, 761 (2d Cir.1998). Because the evidence belies Hayut's contention that the individual defendants "did absolutely nothing to remedy the discrimination," we consider only whether Hayut proffered sufficient evidence to permit a finding that the timeliness or nature of the response by the SUNY defendants amounted to deliberate indifference.
 
 
 60
 Despite Hayut's conclusory allegations to the contrary, the uncontroverted evidence suggests that the individual defendants responded to Hayut's complaint reasonably, in a timely manner, and in accordance with all applicable procedures. In December 1998, upon first hearing of Professor Young's conduct, Dean Varbero discussed the complaint with Hayut and Merante for one hour. He advised Hayut to notify Professor Brownstein (both in his capacity as Hayut's academic advisor and as Chair of Professor Young's department), and to make a written complaint. Hayut chose not to provide such a complaint until early February 1999.[12] Moreover, Dean Varbero advised Hayut to return to his office if she was dissatisfied with the response she received from Professor Brownstein. Hayut chose not to do so.
 
 
 61
 On his own, Dean Varbero contacted Professor Brownstein, and Dean Benjamin, regarding Hayut's verbal complaint and organized a meeting to be held when the Spring 1999 semester began. Attending this meeting was, among others, the SUNY New Paltz AAO. This action by Dean Varbero and the remaining individual defendants occurred prior to Hayut ever submitting a written complaint, which, under the applicable collective bargaining agreement, is a predicate step to pursuing any formal disciplinary action against a tenured professor. Immediately after receiving Hayut's written complaint, reassured about the sincerity of her desire to pursue her allegations against Young, the individual defendants convened a counseling session with Young. Although Young requested leniency, he was informed that the matter was serious, would be handled accordingly, and that disciplinary action might well follow. Within weeks, Professor Young had resigned from SUNY New Paltz.
 
 
 62
 All told, the uncontroverted evidence indicates that SUNY, by and through the actions of its officials, (the individual defendants), acted expeditiously and reasonably, and exhibited no indifference at all to Hayut's allegations. Hayut has presented no evidence, other than purely conclusory allegations, suggesting that the matter should have been addressed more swiftly. Indeed, the SUNY New Paltz AAO explained that, under the circumstances, even if Hayut had sought her assistance directly, she would have been unable to respond more quickly than was done by the individual defendants. This evidence is, moreover, corroborated by the SUNY Internal Grievance Procedure, and Hayut offers nothing to refute the AAO's testimony.
 
 
 63
 Nor is there any merit to Hayut's claim that Dean Varbero violated federal law and, therefore, exhibited deliberate indifference as a matter of law when he failed to report Hayut's verbal complaint immediately to the SUNY New Paltz Affirmative Action Office. The applicable federal regulations governing the promulgation of grievance procedures and appointment of responsible officials in federally-funded institutions, on which Hayut relies, mandate no such action. Rather, the recipient of federal funds (here, SUNY New Paltz) is merely required to designate an AAO and notify its students and employees of the officer's name, office address, and telephone number. See 34 C.F.R. § 106.8.[13] There is no dispute that the SUNY defendants complied with this regulation and, in addition, did, in fact, inform the AAO within weeks of Hayut's oral complaint. That the individual defendants also sought to address the matter informally does not suggest any attempt to stymie more formal measures, as the grievance procedures for the SUNY defendants permit concurrent informal complaint processes.[14]
 
 
 64
 We, therefore, find that, on the undisputed facts of this case, no reasonable jury could conclude that the response by the individual defendants, on behalf of the SUNY defendants, exhibited deliberate indifference. It follows that there is no evidence supporting Title IX liability against the SUNY defendants. Accordingly, we affirm the district court's grant of summary judgment in this respect.
 
 D. Claims Against The Individual Defendants
 1. Section 1983 Claim
 
 65
 In support of her section 1983 claim against the individual defendants, Hayut relies on several different theories, all of which lack merit. First, Hayut predicates her section 1983 claim against the individual defendants on a theory of respondeat superior. It is well settled, however, that the doctrine of respondeat superior standing alone does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity. See Monell v. Department of Soc. Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (discussing municipal liability).
 
 
 66
 Evidence of a supervisory official's "personal involvement" in the challenged conduct is required. Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 254 (2d Cir.2001) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995)). "Personal involvement" is not limited to direct participation by the supervisor in the challenged conduct, but may also be established by evidence of an official's (1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates. Id.
 
 
 67
 As discussed above, Hayut makes no claim and provides no evidence that the individual defendants directly participated in any of Young's harassment. Instead, Hayut argues in her complaint that sexual harassment and discrimination at SUNY Paltz by other instructors was rampant and argues that the individual defendants knew or should have known about many instances of instructors other than Young who "exhibited bizarre, disturbing, harassing and discriminatory behavior" against students. Failure to act despite this "rampant" harassment, she contends, constitutes "direct and personal involvement." Once again, Hayut provides no evidentiary support for her contention of rampant harassment by scores of instructors. In addition, Hayut contradicts this allegation by testifying at her deposition that, to her knowledge, there were no other instructors who exhibited any such behavior or harassed or discriminated against students.
 
 
 68
 There is also no evidence that, after becoming aware of the alleged harassment, any of the individual defendants failed to respond or remedy the situation, that any of these individual defendants created or allowed a policy to continue under which alleged harassment could occur, or that they were grossly negligent in monitoring Young's conduct. As discussed above in finding no Title IX liability as a matter of law, the response of the individual defendants to Hayut's allegations was timely and reasonable under the circumstances. We see no basis for reaching a contrary conclusion with respect to the individual defendants' liability under section 1983.
 
 
 69
 Finally, Hayut's "class of one" theory of discrimination under section 1983 is also unavailing. Hayut contends that the individual defendants established a procedure to discourage and prevent her from pursuing her harassment complaint. But we are presented only with Hayut's conclusory allegations that the individual defendants intentionally treated her differently from other similarly-situated students after she reported Professor Young's conduct. And we find no evidence that the individual defendants embarked on any obstructive scheme, or that the allegedly differential treatment — of which we cannot find indications anywhere in the record — was either intentional or lacked a rational basis. Accordingly, her "class of one" claim fails. See Olech, 528 U.S. at 564, 120 S.Ct. 1073 (recognizing "class of one" claimant must assert intentional differential treatment that lacks a rational basis in order to state a claim for relief); see also Giordano v. City of New York, 274 F.3d 740, 751 (2d Cir.2001) (recognizing that to survive summary judgment, "class of one" claimant must present evidence that any differential treatment was intentional, irrational, and wholly arbitrary) (citing Olech, 528 U.S. at 564, 565, 120 S.Ct. 1073).[15]
 
 
 70
 We conclude that the district court properly granted summary judgment on Hayut's section 1983 claim against the individual defendants.
 
 2. State Equal Protection Claim
 
 71
 Hayut's state equal protection claim against the individual defendants under Article I, Section 11 of the New York State Constitution mirrors her federal equal protection claim brought under section 1983.[16] Because the state constitutional tort action is analyzed under the same standard as Hayut's section 1983 suit, see Brown v. State, 89 N.Y.2d 172, 190, 652 N.Y.S.2d 223, 674 N.E.2d 1129 (1996) ("[Article I, section 11 of the New York State Constitution] was intended to afford coverage as broad as that provided by the Fourteenth Amendment to the United States Constitution....") (citing Dorsey v. Stuyvesant Town Corp., 299 N.Y. 512, 530, 87 N.E.2d 541 (1949)), and because Hayut relies on identical facts to support both claims, the state equal protection action suffers the same fate as the section 1983 claim against the individual defendants. Having found that summary judgment was properly granted on the section 1983 claim against those defendants, we also conclude that the district court correctly granted summary judgment in the state constitutional tort action.
 
 3. Ministerial Neglect Claim
 
 72
 Hayut maintained below, and asserts on appeal, that federal regulations, see 34 C.F.R. § 106.8, and state regulations, see N.Y. Comp.Codes R. & Regs. tit. 9, § 4.19 ("Executive Order No. 19"), required the individual defendants (1) immediately to notify the AAO of any sexual harassment complaint, (2) expeditiously and thoroughly to investigate all such allegations, and (3) to follow up and make sure that any harm inflicted on the alleged victim as a result of the harassment was rectified. Because, the argument goes, none of the individual defendants notified the AAO, investigated the harassment, or followed up with Hayut in the months after her complaint, they committed ministerial neglect under New York law.
 
 
 73
 We note, however, that there is no independent cause of action for ministerial neglect in New York. Rather, a claim of ministerial neglect "merely removes the issue of governmental immunity from a given case." Lauer v. City of New York, 95 N.Y.2d 95, 99, 711 N.Y.S.2d 112, 733 N.E.2d 184 (2000). In other words, "[m]inisterial negligence may not be immunized, but it is not necessarily tortious." Id. Accordingly, there must be some showing that the conduct by the official violated some duty to the injured party directly, as opposed to a "general duty to society." Id. at 100, 711 N.Y.S.2d 112, 733 N.E.2d 184 (internal quotation marks and citations omitted). "Without a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm." Id. at 96, 711 N.Y.S.2d 112, 733 N.E.2d 184. If, however, a duty to a particular individual or class is voluntarily assumed, even if it is one that would not otherwise exist except to the general public, the duty must be performed in a nonnegligent manner. See Florence v. Goldberg, 44 N.Y.2d 189, 404 N.Y.S.2d 583, 587, 375 N.E.2d 763 (1978) ("[W]here a municipality assumes a duty to a particular person or class of persons, it must perform that duty in a nonnegligent manner, notwithstanding that absent its voluntary assumption of that duty, none would have otherwise existed.").
 
 
 74
 Hayut has identified no duty that the individual defendants owed directly to her, as opposed to the general public. Nor has she shown that the individual defendants voluntarily assumed a duty to her or to a specific class of persons, to which she belongs. And her assertions of a duty are not supported by the regulations upon which she relies. Moreover, to the extent that any duty arose under cited federal or state regulations, the individual defendants were in complete compliance with those regulations. Both 34 C.F.R. § 106.8 and Executive Order No. 19 require federally-funded educational institutions to do no more than designate an employee as an AAO who is to receive complaints and to disseminate contact information to students. They do not impose a duty on each and every school official within that institution to report sexual harassment allegations to the designated AAO.
 
 
 75
 It follows that the district court properly granted summary judgment on this claim.
 
 III. CONCLUSION
 
 76
 For the reasons stated above, we hold that the district court erred when it granted Young's motion for summary judgment on Hayut's section 1983 claim. Accordingly, we VACATE the district court's grant of summary judgment on this claim, and REMAND the case to the district court for further proceedings on this claim consistent with this opinion. With respect to all of Hayut's remaining claims against the SUNY defendants and the individual defendants, we hold that the district court correctly granted summary judgment. We, therefore, AFFIRM that portion of the district court's judgment.
 
 
 
 Notes:
 
 
 *
 The Honorable Fred I. Parker, who was a member of the panel, died following argument in this case. Prior to his death his chambers did some very helpful work on the disposition of the case. This appeal is being decided by the remaining two members of the panel, who are in agreementSee Local Rule § 0.14(b).
 
 
 [1]
 Hayut testified that, during a two-week period in the middle of Fall 1998 semester when she attended her brother's bar mitzvah in Israel, Professor Young apparently continued the "Monica" comments, ridiculing her in her absence
 
 
 [2]
 Hayut testified in her deposition that she accompanied her friend Diane Merante, also a student in Professor Young's courses and a witness to the "Monica" comments, to Professor Young's office during the semester to return some classroom materials. During the course of that visit, neither Hayut nor Merante mentioned anything to Professor Young about his remarks, nor did Professor Young make any "Monica" comments to Hayut during that meeting
 
 
 [3]
 In his deposition, Dean Benjamin, Dean of the College of Arts and Sciences, explained the school's procedures that would normally be followed in a situation such as this:
 Generally, if a student has a complaint, he or she brings it to the Chair of the Academic Department. The Chair of the Academic Department may refer it to the Associate Dean who takes care of student complaints and faculty matters, which, was Dean Varbero. Alternatively, the student may approach the Dean's offices without approaching the Chair of the department which basically would refer the student to the Chair for an initial counseling and consideration of whether the Chair should intervene without engaging the Dean's office. So there's a process of complaint. If the complaint is oral and is regarded as sufficiently, potentially sufficiently important to require action by the Dean's office, formal or informal, the informal action might be taken by the Associate Dean following a potential action by the Chair. If formal action's required, the student is requested to provide a written complaint. The student is counseled that a written complaint will be taken in confidence so there will be no retribution taken against the student by the teacher.
 
 
 [4]
 The terms of the collective bargaining agreement then in effect between SUNY and United University Professors, Professor Young's union, required that, before any disciplinary measures could be taken, a formal notice of discipline would need to be issued and served on Professor Young. What information the notice must contain is set forth in Article 19, § 19.4(a), and includes "a detailed description of the alleged acts and conduct including reference to dates, times and places." Those collective bargaining agreement requirements alone mandate that a formal, written complaint must be received by the AAO before any formal further steps could be taken by the administration to discipline the individual committing the challenged conduct
 
 
 [5]
 Hayut alleges in her handwritten complaint that the harassment began during the first week of classes, although her later deposition testimony reveals that the conduct began during the third week of school
 
 
 [6]
 Hayut testified at her deposition that Professor Young touched her "once." This touching occurred during the meeting in Professor Young's office during which Merante returned some classroom materials. When asked at her deposition about any touching by Professor Young, Hayut responded that Professor Young "put his hand on my shoulder, and I shrugged my shoulder, and he just let go and sat down at his desk." No other touching took place and Hayut's claims appear not to be in any way premised on this touching
 
 
 [7]
 In this regard, we note that Young's remarks were potentially taking advantage of an offensive societal stereotype of the woman underling who uses her sexuality with a person in authority to further her career. The existence and arguable reference to such a stereotype makes Young's comments more likely to be gender-based than sexually-charged comments which would as readily be addressed to males as well as femalesSee Reva B. Siegel, Introduction: A Short History of Sexual Harassment, in Directions in Sexual Harassment Law 16 (Catherine A. MacKinnon & Reva B. Siegel eds., 2004) (noting that "judgments about whether practices discriminate `on the basis' of sex or race may depend on evolving social intuitions about whether a practice unjustly perpetuates a status regime, rather than formal characteristics of the practice itself"); cf. Vicki Schultz, The Sanitized Workplace, 112 Yale L.J. 2061 (2003) (arguing that sexual conduct in the workplace does not constitute sex discrimination unless it specifically undermines gender equality).
 
 
 [8]
 There is also some evidence, albeit disputed, that Hayut briefly sought treatment from a mental health professional in early 2000, in connection with injuries resulting from Young's conduct. Counsel for the SUNY defendants asked Hayut at her deposition whether she had ever seen a health care professional for mental or emotional or physical problems stemming from this incident. Hayut stated "[n]ot that I recall." When the name of a particular mental health professional was mentioned, Hayut stated she saw Ms. Marcus once in 2000, but never revisited her. The details of her counseling are somewhat vague, but there is some indication that the counseling was sought in connection with Young's harassment
 
 
 [9]
 Because we find the evidence in the record sufficient to survive summary judgment without consideration of alternative theories, we do not pass on Hayut's "class of one" theory asserted in support of her section 1983 action against Professor YoungSee Village of Willowbrook v. Olech, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam) (discussing "class of one" claims)
 
 
 [10]
 Title IX provides, with certain exceptions not at issue here, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...." 20 U.S.C. § 1681(a)
 
 
 [11]
 To the extent thatKracunas, 119 F.3d 80, held, inter alia, that constructive notice of hostile environment sexual harassment gives rise to Title IX liability for damages, that portion of the holding was overruled by Gebser, 524 U.S. at 290-91, 118 S.Ct. 1989 (re: teacher-on-student harassment), and Davis, 526 U.S. at 644-45, 119 S.Ct. 1661 (re: student-on-student harassment). Associate Justice O'Connor, writing for the Court in both cases, explicitly departed from the respondeat superior principles (which ordinarily govern Title VII actions) for purposes of Title IX. After Gebser and Davis it is clear that in Title IX cases, an educational institution that receives federal funds cannot be held liable for harassment by teachers or students short of the school's actual knowledge of, and deliberate indifference to, the harassment.
 
 
 [12]
 Hayut maintains on appeal that, after several, fruitless return trips to Professor Brownstein's office in December 1998, Merante, Hayut's friend, "left a two-page outline of her complaints with the department secretary to give to [Professor] Brownstein" but "never received a response to that signed, written complaint." We find nothing in the record suggesting Merante's "signed, written complaint" even touched on Hayut's complaints regarding Professor Young's harassment. That Merante received no response from Professor Brownstein, then, has no bearing on the adequacy of the response rendered by the individual defendants in connection with Hayut's allegations
 
 
 [13]
 Section 106.8 ("Designation of responsible employee and adoption of grievance procedures") provides:
 (a) Designation of responsible employee. Each recipient shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to such recipient alleging its noncompliance with this part or alleging any actions which would be prohibited by this part. The recipient shall notify all its students and employees of the name, office address and telephone number of the employee or employees appointed pursuant to this paragraph.
 (b) Complaint procedure of recipient. A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.
 
 
 [34]
 C.F.R. § 106.8
 
 
 [14]
 The formal Grievance Procedure for Review of Allegations of Discrimination for SUNY, enacted in accordance with Title IX, provides that "[t]his procedure ... is in no way intended to supplant or duplicate any already existing grievance procedures, including the informal resolution process presently in practice on many campuses."
 
 
 [15]
 As inGiordano and a predecessor case, Harlen Assoc. v. Incorporated Vill., Of Mineola, 273 F.3d 494 (2d Cir.2001), we decline to resolve whether "Olech changed this Circuit's requirement that a `class of one' plaintiff alleging an equal-protection violation show an illicit motivation," Giordano, 274 F.3d at 751. Hayut fails to provide evidence of any, let alone intentional, disparate treatment by the individual defendants or that any such differential treatment, if it occurred, was irrational or arbitrary.
 
 
 [16]
 Article I, Section 11 provides that "No person shall be denied the equal protection of the laws of this State or any subdivision thereof." N.Y. Const. art. I, § 11