Gerardo **GUERRERO**, Jr., Plaintiff,

v.

State of **CONNECTICUT DEPARTMENT OF CHILDREN AND FAMILIES,** Defendant.

**No. CIV.3:01CV1278(AVC).**

United States District Court, D. Connecticut.

March 20, 2004.

Marc L. Glenn, W. Martyn Philpot, Jr., Law Offices of W. Martyn Philpot, Jr., LLC, New Haven, CT, for Plaintiff.

Eleanor M. Mullen, Hartford, CT, for Defendant.

## RULING ON DEFENDANT'S MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

COVELLO, District Judge.

This is an action for damages brought by Gerardo Guerrero pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, as amended by the Civil Rights Act of 1991 (Title VII). The defendant, the State of Connecticut Department of Children and Families ("DCF"), has filed the within motion for summary judgment (document no. 38) pursuant to Fed.R.Civ.P. 56, contending that there is no genuine issue of fact and that it is entitled to judgment as a matter of law.

The issues presented are: (1) whether Guerrero has raised a genuine issue of fact that the defendant discriminated against him in his employment on account of his race; and (2) whether Guerrero has raised an issue of fact that the conduct which serves as the basis for his hostile work environment cause of action was directed at him because of his race.

For the reasons that hereinafter follow, the court concludes that: (1) Guerrero has failed to raise an issue of fact that the defendant discriminated against him on account of his race; and (2) Guerrero has failed to raise an issue of fact that the conduct which serves as the basis for his hostile work environment cause of action was directed at him because of his race.

The motion for summary judgment (document no 38) is therefore GRANTED.

## FACTS:

Examination of the complaint, Local Rule 56(a) statements, exhibits, motion for summary judgment, and the responses thereto reveals the following undisputed, material facts:

At all relevant times, Gerardo Guerrero, a black male, was employed by the Connecticut Department of Children and Families ("DCF"). The terms of Guerrero's employment with the DCF were governed by a collective bargaining agreement ("CBA"). Under the CBA, employees could only be discharged, demoted or suspended for "just cause." Guerrero initially held the position of social worker trainee. On May 21, 1996, during his tenure as a social worker trainee, Guerrero's then-supervisor, Shirley DeFlavis, gave Guerrero "an official letter of warning regarding deficiencies in [his] work performance in the areas of cooperation, judgment, neglect of duty, and ability to learn new duties."

In June 1997, DCF personnel promoted Guerroro to the position of social worker and transferred him to the DCF "Hotline" division. At the time of his promotion, Guerrero received an employment evaluation of satisfactory. The Hotline is a twenty-four-hour-a-day, three-hundred-and-sixty-five-day-a-year, DCF program that serves, primarily, as the central point for the reception of all telephone calls and written communications alleging child abuse and neglect.[1] The Hotline is staffed by three shifts of social workers. Calls are received by DCF social workers who ask relevant and detailed questions and subsequently enter the information into

---

1. The Hotline also: (1) conducts background checks on prospective employees that want to work with children; and (2) investigates reports on DCF licensed providers through a special unit.

the DCF database, which is known as LINK.

All calls that relate to abuse or neglect must be entered into LINK. Based on the data entered by the social worker, LINK generates a response time that corresponds with the relevant risk assessment. This information is then reviewed by the Hotline supervisor and, if necessary, transmitted to the appropriate regional office for investigation. Although LINK makes the relevant calculations regarding risk assessment, the social worker's judgment in asking the right questions, in the right manner, is nevertheless important in ascertaining the correct information. Failure to ask the right questions in the right manner, or failure to enter the information into LINK, may potentially result in putting a child at risk of fatal harm. Additionally, because the Hotline is the main point of contact between the public and the DCF, positive public relations and customer service are top priorities. Consequently, all social workers who are assigned to the Hotline receive enhanced training regarding asking the right questions, assessing the need for asking additional questions, and evaluating the thoroughness of their report. Guerrero received such training, and, in fact, characterized the training he received as "excellent."

On March 23, 1997, Guerrero received written and oral counseling from his supervisor in connection with certain deficiencies regarding his assessment of a caller's allegations of abuse and neglect, and the time he spent on each call. On August 19, 1997, Guerrero received written and oral counseling in connection with a complaint made by a caller who had dealt with Guerrero. The caller, a mandated reporter, complained that Guerrero was reluctant to report a claim of abuse because the children were living safely with their aunt. The caller also expressed concern regarding Guerrero's attitude and demeanor during the call. On August 23, 1997, Guerrero again received written and oral counseling in connection with his report taking process and intake protocol. More specifically, Guerrero was counseled regarding the proper questions to ask to elicit helpful and necessary information.

On May 11, 1998, DCF personnel held a meeting with Guerrero to discuss two separate complaints received in connection with two separate calls. Both callers complained of Guerrero's lack of empathy and the fact that he was unhelpful. In fact, according to one caller, Guerrero was so unhelpful that she hung up in hopes of calling back and speaking with a different social worker. A review of the tape recordings of the calls indicated that, during one call Guerrero had inadvertently revealed confidential information, and that in both calls he had inappropriately told the callers to call the police before getting all pertinent information. Additionally, Guerrero had failed to log either call into the LINK system. Guerrero's supervisor counseled him regarding his deficiencies and once again reviewed the proper procedures with him. The notes from the meeting indicate that Guerrero was informed that failure to log calls into the system in the future "will result in more formal action and will be considered a performance issue and [will be] addressed in worker's evaluation."

In June of 1998, one Kenneth Mysogland became the Program Director for the Hotline. Mysogland's superior gave him a mandate to clean up the poor perception of the Hotline and raise its level of performance. Prior to Mysogland's arrival, the consensus was that: (1) "the [Hotline] reports were not thorough"; (2) "the proper questions were not [being] asked"; and (3) "there was a perception that the Hotline staff were not appropriate and were not

polite and empathetic while answering telephone calls." According to Mysogland, Guerrero was part of the problem inasmuch as the complaints lodged against him reflected the poor perception of the Hotline.

Soon after his arrival at the Hotline, Mysogland held four supervisory meetings. Guerrero attended two of these meetings. At the meetings, Mysogland emphasized the fact that social workers are often the first point of contact with the public and thus must make a good impression. Mysogland impressed upon the social workers that they were to provide a "responsive, articulate and thorough service to the public and agency." Also, Mysogland reiterated that all calls were to be entered into the LINK system, even those which the social workers believed did not meet the legal standard of abuse and neglect. Mysogland repeated his admonitions at a December 1998 meeting, in a spring 1999 email, and at staff meetings in the fall of 1999.

On August 23, 1998, the Hotline received another complaint regarding Guerrero's interaction with a caller. The caller complained that she "did not enjoy speaking with [Guerrero] ... and at times he was rude and not helpful from where I was coming from."

On April 20, 1999, Guerrero received a call while working at the Hotline. The caller, a nurse, sought to have a child placed in DCF custody because her mother had recently been admitted to the hospital. The caller subsequently complained to DCF personnel that "Guerrero was not responsive and did not understand the significance of the information that she was conveying." Guerrero did not document the call. Because the Guerrero did not enter the information into the LINK system, the DCF took no action. The hospital was therefore forced to make its own plans for the child.

Also on April 20, 1999, Guerrero received a phone call from someone who stated that he had overheard a child being beaten in the home next door. Guerrero told the caller to contact the police. Guerrero failed to get the caller's name, address, or other identifying information. Obtaining such information is standard Hotline Procedure. Guerrero once again failed to enter a record of the call into the LINK system. Because the caller never contacted the police and because Guerrero did not log the call into LINK, DCF never investigated the allegation of abuse. On May 26, 1999, Mysogland commenced an internal DCF investigation regarding the April 20, 1999 calls.

On June 13, 1999, during the pendency of the investigation, Guerrero, who was aware of the ongoing investigation, received a call from an individual who was concerned that his children were being abused. Guerrero once again failed to document the call by entering a record of the call into the LINK system. He also failed to ask the caller his name, get the name of the children, or obtain the caller's phone number, all in contravention of settled DCF policy.

In June of 1999, Mysogland reassigned Guerrero to the first shift to perform various computer searches. The reassignment was in lieu of administrative leave during the pendency of the investigation of the April 20, 1999 calls and the June 13, 1999 call. On July 19, 1999, following a hearing where Guerrero had union representation, the DCF suspended Guerrero for ten days for his actions with regard to the April 20, 1999 calls and the June 13, 1999 call. The specific grounds for his suspension were "neglect of duty" and "engaging in ... activities detrimental to the best interest of the agency." The letter informing Guerrero of his suspension stated that "this letter should ... be taken as a warn-

ing that future similar actions may lead to further disciplinary actions up to and including dismissal."

On July 22, 1999, Guerrero filed a union grievance with regard to his reassignment to the first shift and his ten day suspension. On September 29, 1999, the union upheld Guerrero's grievance regarding his reassignment. The union subsequently submitted the ten day suspension grievance to arbitration. The arbitrator held that the DCF had "just cause" to impose the ten day suspension. Specifically, the arbitrator found that, "while a ten day suspension, in other circumstances, may seem excessive for a first or second disciplinary action, given the history of this particular grievant, the repeated clear notice, and the occurrence of a second infraction while disciplinary action was pending for the first one, it was not unreasonable to impose this penalty for neglect of duty." Rejecting Guerrero's claim of disparate treatment, the arbitrator found that:

> [T]he evidence is that the [DCF] ... made numerous efforts to help Guerrero before imposing serious disciplinary action. It invoked discipline only after years of trying less formal alternatives, and not obtaining a positive result. The few specific instances cited by the union, in which others failed to document calls, had legitimate explanations and were not equivalent to Guerrero's failings. Nor is there evidence that these other social workers received the same kind of counseling and notice as did Mr. Guerrero. Thus, I do not find that he was a victim of disparate treatment.

On September 29, 1999, in a formal performance appraisal, DCF personnel wrote that Guerrero's judgment was "poor and unreliable" and that his work was "often unacceptable with frequent errors or rejections." Although other areas of Guerrero's performance were acceptable, he received an overall evaluation of "unsatisfactory."

On February 20, 2000, Pam Burritt, Guerrero's supervisor, received a complaint from a caller who complained that she did not feel that Guerrero took her complaints seriously and that his demeanor was rude. DCF held a hearing in connection with this complaint and subsequently suspended Guerrero for thirty days based on, *inter alia*, his: (1) "offensive and abusive conduct towards the public"; (2) "neglect of duty"; and (3) "engaging in an activity that is detrimental to the best interests of the agency." Mysolgland sent Guerrero a letter notifying him of the suspension, which stated: "This letter should also be taken as a final warning that future violations of said policies and regulations will result in dismissal."

On July 3, 2000, Guerrero returned to the Hotline after serving his thirty day suspension. That night Guerrero received a call from a nurse requesting permission to treat a seventeen year old boy who claimed to be under DCF jurisdiction. The nurse apparently gave Guerrero the wrong name and Guerrero, based on the miscommunication of the name, accessed a file for a four year old boy. Relying on the information contained within the file for the four year old boy, Guerrero informed the nurse that the child was no longer in DCF custody. The nurse called back later and spoke with another social worker. This social worker located the proper file in the LINK system. The nurse subsequently lodged a complaint with the DCF, contending that Guerrero's manner was offensive and frustrating. On September 11, 2000, following a hearing, the DCF terminated Guerrero's employment based on the July 3, 2000 phone call and Guerrero's past discipline. The union represented Guerrero at the hearing. With regard to the July 3, 2000 phone call,

the letter of termination indicated that Guerrero's actions were in violation of various regulations governing "neglect of duty."

Guerrero filed union grievances with regard to the thirty day suspension and his termination. The grievances were denied and the matters were submitted for arbitration. On August 8, 2001, the arbitrator found that the both the suspension and termination were supported by just cause. Specifically, the arbitrator found "that these are cases of continued neglect of duty and apparent inability to perform the job in a satisfactory manner, which constitute just cause for suspension and termination."

On July 5, 2001, Guerrero filed the present action alleging employment discrimination. Specifically, Guerrero alleges that DCF personnel discriminated against him on the basis of his race when they suspended him and when they discharged him. Guerrero further alleges that DCF personnel cultivated a racially hostile work environment.

### STANDARD:

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute, and that it is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to deter-

mine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

### DISCUSSION:

1. *Title VII: Disparate Treatment Claim*

The DCF first contends that the summary judgment should be granted because Guerrero has failed to raise an issue of fact that he was terminated on the basis of his race. Specifically, DCF contends that Guerrero "has failed to offer any credible evidence to counter the [DCF's] . . . legitimate non-discriminatory reasons for terminating [Guerrero.] Without adequate evidence of pretext, [Guerrero] cannot sustain his burden as a matter of law."

Guerrero responds that "viewing the record in the light most favorable to Guerrero, there is sufficient evidence in the record to establish pretext."

A Title VII cause of action alleging employment discrimination proceeds under the burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that framework, the plaintiff must first establish a prima facie case of discrimination. This requires that "the claimant . . . show that: 1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003). With regard to the prima facie case, the plaintiff's burden is *de minimis*. *See Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988).

"Once a plaintiff has established a prima facie case, the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions." *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003). Finally, "[i]f the defendant proffers such a [legitimate, non-discriminatory] reason, the presumption of discrimination created by the prima facie case drops out of the analysis, and the defendant will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.... The plaintiff must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 767 (2d Cir.2002) (internal quotation marks and citations omitted). In other words, "to defeat summary judgment ... the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003) (internal quotation marks omitted).

■ Applying these principles, the court concludes that summary judgment should be granted in favor of the defendant. Although there is considerable question regarding whether Guerrero can establish a prima facie case, the court need not address this issue, because, even if the court were to assume that Guerrero could establish a prima facie case, summary judgment is nonetheless proper because Guerrero has failed to present any evidence that the defendant's legitimate, non-discriminatory reason for his termination and suspensions was a pretext for discrimination.[2] Guerrero contends that the DCF suspended and terminated him because of his race. The defendant, however, asserts that Guerrero was suspended and fired because of his chronically poor employment record. A review of the record indicates considerable support for the defendant's claim. First, it is undisputed that in the months and years prior to his suspensions and termination, Guerrero had repeatedly received counseling and warnings regarding the fact that his work performance was not satisfactory. Indeed, as early as 1996, Guerrero's supervisor noted certain deficiencies in his work. Moreover, at least eight complaints were lodged against Guerrero during the time that he worked at the Hotline, and, as Guerrero admits, all of them were substantiated.

More importantly, an independent arbitrator found that with regard to the Guerrero's two suspensions, as well as his ultimate termination, the DCF had just cause for its actions. Put simply, independent arbitrators concluded that Guerrero's poor work performance warranted his suspensions and dismissal. Guerrero's "termination occurred, therefore, only after a decision, based on substantial evidence, of an undisputedly independent, neutral, and unbiased adjudicator that had the power to prevent the termination. *This fact is*

---

**2.** Specifically, with regard to Guerrero's prima facie case, the claim that he was qualified for his position is, at best, doubtful. The evidence clearly indicates that, at the time of his termination, Guerrero's performance was poor and that his most recent evaluation indicated that his work was unsatisfactory. *See McLee v. Chrysler Corp.,* 109 F.3d 130, 135 (2d Cir.1997) (plaintiff could not satisfy even minimal prima facie burden where an undisputed pre-termination job evaluation clearly indicated that for race neutral reasons plaintiff's job performance was unsatisfactory). Nevertheless, as discussed above, the court does not address this issue.

*highly probative of the absence of discriminatory intent in that termination."* Collins v. New York City Transit Authority, 305 F.3d 113, 119 (2d. Cir.2002) (emphasis added). Thus, to survive summary judgment, Guerrero "must present strong evidence that the decision was wrong as a matter of fact—e.g. new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised." *Collins v. New York City Transit Authority,* 305 F.3d 113, 119 (2d Cir.2002).

Guerrero, however, does not challenge the arbitrator's impartiality or the fairness of the arbitration proceeding. Indeed, Guerrero's memorandum fails to address the arbitrator's conclusions in any substantive manner. Rather, Guerrero raises essentially three arguments in an attempt to call into doubt the defendant's proffered reasons for his suspensions and termination. None of them are persuasive. First, Guerrero contends that, contrary to the DCF's contention and the arbitrators' findings, his work performance was satisfactory. In support of this contention, Guerrero relies on Mysogland's deposition testimony where he states that in 1998 Guerrero's performance, though not without "issues", did not "rise to the overall level of unsatisfactory" and therefore could be characterized as satisfactory. Although Mysogland did make this statement, in the same deposition, Mysolgland characterizes Guerrero's job performance in 1999 and 2000 as unsatisfactory. Of course, 1999 and 2000 is the relevant time period inasmuch as the suspensions and terminations—the conduct that Guerrero claims is actionable—occurred during that time. Accordingly, Guerrero's reliance on the

1998 evaluation is unavailing. *See Leffel v. Valley Financial Services,* 113 F.3d 787, 794–95 (7th Cir.1997) (satisfactory reviews received previously do not call into question the subsequent criticisms that culminated in discharge).

█ Second, Guerrero asserts that other DCF employees were treated differently than he was. Specifically, Guerrero contends that a white "comparator was terminated but then reinstated to employment via a transfer."[3] Although dissimilar treatment of similarly situated employees can serve as evidence that an employer's legitimate, non-discriminatory reason for an adverse employment action was a pretext for discrimination, *see Graham v. Long Island R.R.,* 230 F.3d 34, 43 (2d Cir.2000), the employees to be compared must be similarly situated in all material respects. *See Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir. 2000). Determination of whether the employees are similarly situated in all material respects "must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir. 2000).

█ Under this standard, Guerrero is not similarly situated to the comparator. Put simply, the comparator did not have the history of past disciplinary problems that Guerrero had. In fact, the comparator's termination was a result of her first offense. Guerrero, on the other hand, had

---

3. Guerrero also claims that his "termination was the only termination that remained as such, ... [t]he other terminations were eventually reduced to reinstatements with suspensions." Guerrero, however, fails to provide any evidentiary support for this claim. The

court therefore does not consider this contention. *See Byrnie v. Town of Cromwell Board of Educ.,* 243 F.3d 93, 101 (2d Cir.2001) ("non-moving party may not rely on conclusory allegations or unsubstantiated speculation").

received at least four oral and written counseling sessions, a ten day suspension, and a thirty day suspension before he was ultimately terminated. Thus, Guerrero is dissimilar from the comparator based on the fact that his disciplinary record is far worse than that of the comparator. *See Maniccia v. Brown,* 171 F.3d 1364, 1369 (11th Cir.1999) (concluding that plaintiff was not similarly situated to comparator because, in part, comparator had not committed the same number of policy violations); *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 349 n. 3 (7th Cir.1997) (same).

Finally, Guerrero challenges DCF's legitimate non-discriminatory reasons for his termination by noting that there were other methods of less drastic discipline, namely so-called "last chance agreements" and additional training. Last chance agreements are options in lieu of termination, negotiated through an informal process between the union and the state agency. Such arrangements are initiated by the union and require an admission of wrongdoing on the part of the accused and a commitment to follow DCF policies in the future.[4] Guerrero, however, failed to admit any wrongdoing with regard to the conduct underlying his thirty day suspension and termination, and the union never initiated any such negotiations on his behalf. Thus, contrary to Guerrero's assertion, a last chance agreement was not an option in this case.

Nevertheless, putting aside the question of whether such lesser forms of discipline were available, Guerrero fails to articulate the any relevant inference to be drawn from the fact that the DCF had less severe forms of discipline available, but choose not to use them. The court will not ascribe discriminatory intent to an employer's choice of disciplinary methods based solely on the fact that there were less severe methods of discipline available. Such a conclusion would essentially render every termination discriminatory inasmuch as there is likely always a less severe method of discipline than that of termination. Additionally, to the extent that Guerrero contends that the mere availability of lesser forms of disciple indicates that he was treated differently than others, Guerrero does not identify a case where such lesser forms of discipline were employed in a situation that is similar in all material respects to his case.

The court therefore concludes that Guerrero has failed to satisfy the burden of proving pretextual discrimination where, as here, there is overwhelming evidence to support the DCF's legitimate business reasons for the termination and suspensions. Accordingly, summary judgment is granted with respect to the Title VII disparate treatment cause of action.[5]

2. *Title VII: Hostile Work Environment*

DCF next contends that summary judgment should be granted in its favor with regard to Guerrero's hostile work environment claim. Specifically, DCF contends that Guerrero's hostile work environment

---

4. Relying on a citation to the arbitrator's opinion, Guerrero contends that this is not the case. The portion of the arbitrator's opinion cited by Guerrero, however, has absolutely nothing to do with last chance agreements. Having reviewed the entire arbitrator's opinion, the court cannot identify anything that remotely supports Guerrero's contention; the court therefore rejects Guerrero's denial.

5. DCF also contends that summary judgment should be granted because: (1) Guerrero was not qualified to retain his position; and (2) Guerrero's termination did not occur in such a manner as to give rise to an inference of discrimination. Having concluded that judgment is warranted on other grounds, the court need not reach these issues.

is flawed because: (1) "what [Guerrero] alleges to be harrassment is in reality a group of discrete acts"; and (2) "there simply is no evidence that the acts complained of by [Guerrero] ... as harassing were motivated by his race."

Guerrero responds that "[i]n the aggregate, Guerrero was subjected to excessive scrutiny concerning his performance as a Hotline worker."

■ "[S]urviving summary judgment on a hostile environment claim under [Title VII] ... requires evidence not only that the victim subjectively perceived the environment to be hostile or abusive, but also that the environment was objectively hostile and abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult, ... that is sufficiently severe or pervasive to alter the conditions" of the plaintiff's employment. *Hayut v. State University of New York*, 352 F.3d 733, 745 (2d Cir.2003) (internal quotation marks omitted). The determination of whether an environment was hostile, "entails examining the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with" the victim's employment. *Hayut v. State University of New York*, 352 F.3d 733, 745 (2d Cir.2003) (internal quotation marks omitted). Moreover, a plaintiff raising a "Title VII hostile environment claim ... must produce evidence that she was discriminated against because of her race ...." *Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 440 (2d Cir.1999).

■ Applying these principles, the court concludes that Guerrero has failed to raise an issue of fact with regard to his hostile work environment claim. Guerrero does not claim any type of improper remark, racial slur, threatening comment, or physical abuse as the basis of his claim. Rather, the gravaman of Guerrero's claim is that his work environment was hostile because he was subject to excessive scrutiny concerning his performance at the Hotline. In other words, the conduct that Guerrero alleges as hostile is the various discipline he suffered as result of his poor performance. Guerrero, however, fails to provide any evidence sufficient to raise a question of fact that such discipline was undertaken because of his race. The only evidence that Guerrero cites to is the alleged "uneven application of DCF's disciplinary policy." The court has previously concluded, however, that there was no such uneven application of the disciplinary policy because Guerrero was not similarly situated to the comparators. Thus, the record is devoid of any evidence that he was discriminated against on the basis of his race, and, therefore, judgment should be granted in DCF's favor.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment (document no. 38) is GRANTED.